UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, by its Executive Office of Health and Human Services<br><br>                    Plaintiff,<br><br>          v.<br><br>KATHLEEN SEBELIUS, in her official capacity as Secretary of Health and Human Services of the United States;[1] CHARLENE FRIZZERA, in her official capacity as Acting Administrator of the Centers for Medicare and Medicaid Services; CENTERS FOR MEDICARE AND MEDICAID SERVICES; and DEPARTMENTAL APPEALS BOARD of the United States Department of Health and Human Services<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION<br>)  NO. 09-10274-WGY<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM AND ORDER

YOUNG, D.J.                                        March 24, 2010

## I.    INTRODUCTION

The Massachusetts Executive Office of Health and Human

Services ("Mass. Services") brings this action against Kathleen

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the Court has automatically substituted Kathleen Sebelius for Charles E. Johnson, as Ms. Sebelius currently holds the office of Secretary of Health and Human Services.

Sebelius, as Secretary of Health and Human Services of the United States (the "Secretary"); Charlene Frizzera, as Acting Administrator of the Centers for Medicare and Medicaid Services (the "Center"); and the Departmental Appeals Board of the United States Department of Health and Human Services (the "Board")(collectively the "Defendants").  Mass. Services seeks judicial review of a decision of the Board, <u>Massachusetts Executive Office of Health and Human Services</u>, No. A-08-83, 2008 WL 5501237, Decision No. 2218 (Department of Health and Human Services, Departmental Appeals Board, December 31, 2008) (the "Board's Decision"), which affirmed the disallowance of $86,645,247 in federal financial participation funds (the "Funds" or "FFP") that were authorized under the Medicaid Act (the "Act"), 42 U.S.C. §§ 1396 <u>et seq.</u>  In the alternative, Mass. Services seeks a declaration that section 1915(g) of the Act, 42 U.S.C. § 1396n(g)(2), is an unconstitutional exercise of the Spending Power of Congress.  The parties filed cross motions for summary judgment and agreed to resolve the litigation as a "case stated."[2]

---

[2] Derived from the procedures of the courts of the Commonwealth of Massachusetts, <u>see, e.g.</u>, <u>Parker</u> v. <u>Morrell</u>, 59 Mass. App. Dec. 34 (Mass. Dist. Ct. 1976), the "case stated" procedure is firmly established in the jurisprudence of the First Circuit.  <u>See, e.g.</u>, <u>Situation Mgmt. Sys., Inc.</u> v. <u>ASP Consulting LLC</u>, 560 F.3d 53, 58 (1st Cir. 2009); <u>Continental Grain Co.</u> v. <u>Puerto Rico Maritime Shipping Auth.</u>, 972 F.2d 426, 429 n.7 (1st Cir. 1992); <u>Boston Five Cents Sav. Bank</u> v. <u>Sec'y of Dep't of Hous. and Urban Dev.</u>, 768 F.2d 5, 11-12 (1st Cir. 1985); <u>Bunch</u> v.

A.   **Background**

The Medicaid Program ("Medicaid"), administered by the

Department of Health and Human Services (the "Department")

through the Center, is designed to assist states in providing

health care services to certain eligible persons.   42 U.S.C. §§

1396 et seq.; Harris v. McRae, 448 U.S. 297, 308 (1980).   The

Act's broad purpose is to provide medical assistance[3] to

---

W.R. Grace & Co., 532 F. Supp. 2d 283, 286-87 (D. Mass. 2008).
It is a most helpful procedural device.   In this session of the
Court, it works like this: whenever cross motions for summary
judgment reveal that the relevant facts appear without
significant dispute, the courtroom deputy clerk offers the
parties to treat the case as a case stated.   Should they accept,
as was the case here, the Court treats the undisputed facts as
the established record and draws the reasonable inferences
therefrom without the necessity of drawing adverse inferences
against each moving party, see Fed. R. Civ. P. 56.   The facts of
the case being established, the Court affords each party thirty
minutes for final argument (not the usual ten minutes per party
when hearing argument on a motion).   In due course, the Court
enters findings and rulings as required by Fed. R. Civ. P. 52(a).

[3] Although there has been some discussion of a Circuit split
regarding the definition of "medical assistance" in cases
involving claims under 42 U.S.C. § 1983, it does not bear upon
this Court's conclusion.   To illustrate: section 1396n(g)(2),
which authorizes reimbursement for case management services,
allows states to provide targeted assistance in gaining access to
medical, educational or social services.   Two interpretations of
section 1396n(g)(2) are possible: (1) the case management statute
provides either that states must assist eligible individuals in
gaining access to actual medical, social, or educational
services, or (2) it provides that states must provide access to
payment for such services.   Compare Bruggeman v. Blagojevich, 324
F.3d 906, 910 (7th Cir. 2003) (holding that plaintiffs' Medicaid
claim failed because "Medicaid is a payment scheme, not a scheme
for state-provided medical assistance" and that the "statutory
reference to 'assistance' appears to have reference to financial
assistance rather than to actual medical services"); Mandy R. ex
rel. Mr. & Mrs. R. v. Owens, 464 F.3d 1139, 1146 (10th Cir. 2006)

under-privileged families and individuals and to help families or individuals attain independence or self care.  42 U.S.C. § 1396. The Act specifies numerous broad categories of medical assistance that are reimbursable under Medicaid, including hospital services, physician services, nursing facility services, and case management services.  42 U.S.C. § 1396d(a).  Section 1396d(a)(19) of the Act authorizes reimbursement for case management services, as defined by section 1396n(g)(2) of the Act.  42 U.S.C. § 1396d(a)(19).  Under Section 1396n(g), a state may elect to provide targeted case management services, meaning that it limits its case management services to certain groups of eligible individuals.  42 U.S.C. § 1396n(g)(1).  The Act defines "case management services" as "services which will assist individuals eligible under the plan in gaining access to needed medical, social, educational, and other services."  42 U.S.C. § 1396n(g)(2)(A)(i).

-------

(affirming judgment in favor of defendants in 42 U.S.C. § 1983 action where disabled persons alleged that state failed to comply with reasonable promptness requirement of Medicaid by keeping them on waiting list for state's comprehensive residential services because "Medicaid statute does not require states to be service-providers" <u>with</u> <u>Bryson</u> v. <u>Shumway</u>, 308 F.3d 79, 88-89 (1st Cir. 2002) (holding that plaintiffs have a cause of action under 42 U.S.C. § 1983 where state created an experimental home and community-based medical program but placed plaintiffs on the waiting list); <u>Doe</u> v. <u>Chiles</u>, 136 F.3d 709, 714, 717 (11th Cir. 1998) (holding that plaintiffs had claim under 42 U.S.C. § 1983 against state where state had created an intermediate care facility but placed plaintiffs on waiting list).  Neither interpretation of the statute's plain language supports Mass. Services' claim that direct services are reimbursable.

Each state is required to develop a comprehensive plan describing the nature and scope of its Medicaid program.  42 C.F.R. § 430.10.  State plans must be approved by the Center.  42 C.F.R. §§ 430.14-430.16.  If states are in compliance with the Act, the Department automatically distributes funds to them in furtherance of these goals.  <u>Massachusetts</u> v. <u>Sec'y of the U.S. Dep't of Health and Human Servs.</u>, 816 F.2d 796, 801 (1st Cir. 1986), <u>aff'd in part and rev'd on other grounds sub nom.</u> <u>Bowen</u> v. <u>Mass.</u>, 487 U.S. 879 (1988).  The plans are financed both by federal and state funds.  Federal financial assistance funds, called "reimbursement[s] . . . [are] actually a series of huge quarterly advance payments that are based on the State's estimate of its anticipated future expenditures."  <u>Bowen</u>, 487 U.S. at 883-84 (citing 42 U.S.C. § 1396b(d)).  "If something is 'medical assistance' the Secretary must pay a percentage of its costs."  <u>Id.</u>

The estimated expenditures are "adjusted to reflect actual expenditures," and "[o]verpayments may be withheld from future advances."  <u>Id.</u> at 884 (citing 42 U.S.C. § 1396b(d)(5)).  If the State's expenditures do not comply with the requirements of federal law, the federal agency may disallow reimbursement for any item or class of items.  42 U.S.C. § 1316(d).  The Supreme Court has recognized that "a disallowance represents an isolated and highly focused inquiry into a State's operation of the

assistance program." Bowen, 487 U.S. at 885 (internal quotation omitted). In actuality, as will be seen, the federal government manages the state plans in mind numbing detail.

## II. FINDINGS OF FACT

In Massachusetts, Mass. Services administers the Medicaid plan. Mass. Gen. Laws ch. 6A, § 16. In 1994, Mass. Services sought approval of State Plan Amendment TN 94-017 (the "1994 Plan"), requesting Funds for various targeted case management services performed by the employees of the Massachusetts Department of Social Services ("MDSS"). A.R. 167-69.[4] The 1994 Plan defined the "targeted group" as Medicaid-eligible children who may potentially be abused or neglected, or Medicaid-eligible children who are currently receiving services from MDSS after a determination that they were either abused or neglected or posed a risk of being abused or neglected. A.R. 168. The 1994 Plan identified the services to be provided to the targeted group as the: "1) collection of assessment data; 2) development of an individualized plan of care; 3) coordination of needed services and providers; 4) home visits and collateral contracts as needed; 5) maintenance of case records; and 6) monitoring and evaluation of client progress and service effectiveness." A.R. 168.

---

[4] All citations to documents incorporated into the Administrative Record that were filed manually on May 4, 2009 [Doc. No. 6] are abbreviated as A.R. and accompanied by the appropriate page number(s).

After the 1994 Plan was approved, Mass. Services and the
Center engaged in continuous discussions as to what ought be
considered reimbursable under the terms of that Plan.  <u>See</u>
Bothamley Aff. at A.R. 186-87; Letter from Susan Maciolek,
Revenue Contract Manager, to Jack Briggs, Health Care Financing
Administration (Jan. 25, 1996) at A.R. 190-92 (questioning what
Mass. Services identified as protective intake); Letter from
Susan Maciolek, Revenue Contract Manager, to Harold Finn, Health
Care Financing Administration, (Feb. 15, 1996) at A.R. 196-97
(discussing how claims would be "tracked and identified").

In May 2006, the Office of the Inspector General of the
Department (the "Inspector") issued a Review of Targeted Case
Management Services Rendered by the Massachusetts Department of
Health and Human Services (2006) (the "Review").  A.R. 112.  The
Review detailed expenditures for fiscal years 2002 and 2003 under
the Medicaid program and concluded that Mass. Services had
overstated its allowable targeted case management expenditures
for these years.  A.R. 126.  It noted that the Funds were used
not only for allowable case management services, but also for
direct social services, which were not reimbursable when claimed
as case management services.  <u>Id.</u>  The Review refrained from
expressing an opinion on whether case management services that
were inherent in, and inseparable from, direct services, were
reimbursable or not.  <u>Id.</u>  The Review recommended that Mass.

Services return $86,645,347 to the federal government, which had been claimed for services that, in fact, were direct services, and that it work with the Center to determine the status of the funds used for services of a dual nature.  Id.

On March 20, 2008, the Center officially disallowed $86,645,347.  Letter from Richard McGreal, Associate Regional Administrator, Department of Health and Human Services, to Thomas Dehner, Director, Executive Office of Health and Human Services, (March 20, 2008) at A.R. 40-42.  Mass. Services appealed this decision to the Board on April 22, 2008.  Acknowledgment of Notice of Appeal at A.R. 43.  The Board's Decision affirmed the disallowance of the Funds.  Board's Decision, 2008 WL 5501237, at *HHS 35.

    1.   The Board's Decision

The Board's Decision affirmed the Report's finding that eight types of services ("cost categories", or "cost centers") as defined in Massachusetts' Random Moment Time Study[5] ("RMTS") and

---

[5] In 1995, the United States Office of Management and Budget issued a circular to all state, local and Indian Tribal governments establishing principles and standards for cost reimbursements.  OMB Circular A-87.  The circular established that all allowable costs must be "necessary and reasonable for proper and efficient administration of the program, be allocable to Federal awards, and be adequately documented."  OMB Circular A-87m Att. A, § C.1.  The reimbursement recipients, however, could use sampling methods to allocate salaries to Federal awards as long as the method met "acceptable statistical sampling methods."  OMB Circular A-87, Att. B, § 8.h.6.a.  Massachusetts used a Random Moment Time Study to fulfill these requirements. As applicable to this case, a randomly selected social worker

provided for under the 1994 Plan did not meet the definition of case management services.  These services included: (1) Protective intake; (2) Case management;[6] (3) Preparation for and participation in legal proceedings; (4) Referrals to the district attorney; (5) Child placement; (6) Investigative efforts; (7) Services for children with special needs; and (8) All other permanency planning activities.  Board's Decision, 2008 WL 5501237, at *HHS 14.

        a.    Protective intake

    Although Mass. Services argued to the Board that the "protective intake" cost center was the "first step in the process of developing a child's service plan," the Board agreed with the Center that it was more appropriate to look at the definition of "protective intake" according to the RMTS.  Board's Decision, 2008 WL 5501237, at *HHS 15-16.  With regard to "protective intake," the RMTS describes it, in relevant part, as the following:

    This activity code is for investigative efforts to

_____

will report how he spent his time and record that time under an activity code that corresponds with a "cost center" defined in the RMTS.  The cost centers are categorized according to what program covers those costs.  Board Decision, 2008 WL 5501237 at *HHS 7, *HHS 27.

    [6] The term "case management cost centers" should not be conflated with the term "case management services."  The former refers to the type of services claimed by Mass. Services in its 1994 Plan, the latter is the term used in the Act for reimbursable services.

prevent or eliminate the need for removal of children
from their homes for all cases where a removal of a child
from his or her home has not occurred (but such a removal
is, to the caseworker, a reasonable possibility in the
absence of preventive services). . . . The conduct of the
following activities are among those investigative
efforts to prevent or eliminate the need for removal of
a child from his or her home:

(1) Receipt and screening to determine, based upon the
facts in a report of suspected abuse or neglect whether
there is or may be reasonable cause to believe that a
child(ren) has been abused or neglected or may be at the
risk of being abused or neglected by a caretaker . . . .

(2) Investigation to determine if there is reasonable
cause to believe that a child(ren) has been or may have
been abused or neglected or may be at risk of being
abused or neglected by a caretaker and to protect the
child(ren) from further abuse or neglect . . . .

A.R. 338 (italics omitted).  The Board stated that "screening and

investigation, the two elements of protective intake, serve to

substantiate, or rule out a report of abuse or neglect."  Board's

Decision, 2008 WL 5501237, at *HHS 17 (internal quotation

omitted).  The Board continued:  "[T]he relevant RMTS activity

code does not mention activities focused on identifying a child's

service needs.  According to that code, the focus of protective

intake is on ascertaining the risk of harm to the child."  Id. at

*HHS 18 (internal quotation omitted).  It found that the purpose

of protective intake is not to help an individual in gaining

access to medical, educational or social services, but rather it

is to provide the agency with information as to how to proceed in

specific cases.  Id. at *HHS 17.

b.   Case management cost centers

In determining the right to reimbursement for the two "case management" cost centers, the Board primarily relied upon the language from the RMTS which in relevant part notes:

> This activity code is for general case management and case supervision activities for all cases where a removal of a child from his or her home has not occurred (but such removal is, to the caseworker, a reasonable possibility in the absence of preventive services) and includes all intact family cases which can be so described. This activity is generally equivalent to initial case assignment, subsequent case assignment, and ongoing casework activities as described in the Case Practice Policy and Procedures Manual.

Id. at *HHS 20. The RMTS then provides examples of activities that fall within the "case management" cost centers.  Id. at *HHS 21.  The Board concluded that these cost centers "identifie[d] administrative activities (e.g., case assignment, establishing and maintaining MDSS-family contact, arranging child-family visitation schedules, documenting MDSS-family interaction) that [were] performed in response to, or in conjunction with, a determination by a MDSS social worker that a child [was] at risk of abuse or neglect."  Id. at *HHS 22.  The Board's Decision also indicated that "[o]n its face [the activity code] contains no words or phrases - such as 'helping' or assisting a child 'find,' 'locate,' or get 'access' to 'needed medical, social, education, and other services' - that clearly or expressly signal that it was intended to capture [case management services]."  Id.  The Board acknowledged that one group of activities within this cost

center did seem to describe "medical assistance."  The case
management cost centers covered activities:

> <u>Assisting clients, on an ongoing basis, in identifying
> and obtaining available services to meet assessed needs.</u>
> Activities include specifying services to be provided in
> the family's service plan, determining what services are
> appropriate and available, providing assistance to the
> client in obtaining services either by making a referral
> or by providing information on how the client can obtain
> the service directly, completing service authorizations,
> etc. . . .

<u>Id.</u>  The Board concluded, however, that Mass. Services failed to
specify what percentage of the time allotted to the case
management cost centers related to this activity, and Mass.
Services bore the burden of identifying and quantifying the
allowable costs.

<blockquote>c.   The other disallowed cost centers</blockquote>

The Board's Decision stated that the remaining disallowed
cost centers, "have activity codes that appear to describe
direct, child protective services – namely, activities whose
immediate and primary aim is not to help a child gain access to
needed medical, educational, and other social services, but to
protect vulnerable children and place them in a safe living
environment."  <u>Id.</u> at *HHS 25.  As examples, the Board quoted the
RMTS for the cost centers "preparation for and participation in
judicial proceedings" and "referrals to the district attorney."
<u>Id.</u>  The RMTS defines "preparation for and participation in
judicial proceedings" as the activity code "for the preparation

12

for and participation in judicial determinations, court proceedings or voluntary placement agreements regarding removals of children from their homes and placement into substitute care." Id.  The RMTS defines "referrals to the district attorney" as the activity code "for notification and provision of information to the appropriate District Attorney and local law enforcement authority if certain specific conditions have resulted from abuse or neglect."  Id.  In addition, the Board noted that with regard to "services for children with special needs"[7] and "all other permanency planning services,"[8] those cost centers involve activity with the apparent purpose of "facilitat[ing] the placement of a child in a permanent living arrangement".  Id. at *HHS 25, n.19.  The Board concluded that Mass. Services did not "indicate[] how or why these activity codes should in these circumstances be read as descriptions of case management."  Id. at *HHS 25.  Moreover, to the extent that some of the activity

_____

[7] The RMTS states in relevant part that "services for children with special needs" encompasses services "relative to arrangement for and entry into adoption assistance agreements with adoptive parents of children with special needs, and the making of payments of non-recurring adoption expenses incurred by or on behalf of such parents in connection with the adoption of such a child."  A.R. 246.

[8] The RMTS states in relevant part that "all other permanency planning services" encompasses "all other worker services relative to permanency planning not associated with the arrangement for and entry into adoption assistance agreements with adoptive parents of children with special needs, and the making of payments of non-recurring adoption expenses incurred by or on behalf of such parents in connection with the adoption of such a child."  A.R. 246.

13

codes captures both direct services and case management, Mass.
Services did not present any evidence to identify and quantify
the allowable case management cost allocation.  Id.

## III. RULINGS OF LAW

### A.   The Spending Clause and the Tension Between Pennhurst and Chevron

Under the Spending Clause, Congress has the power to provide
for the "general welfare of the United States."  U.S. Const. art.
I, § 8 cl. 1.  Deference should be afforded to what Congress
deems the "general welfare."  South Dakota v. Dole, 483 U.S. 203,
207 (1987) ("In considering whether a particular expenditure is
intended to serve general public purposes, courts should defer
substantially to the judgment of Congress."); United States v.
Butler, 297 U.S. 1, 67 (1936) ("[Challenges to the Spending
Power] require a showing that by no reasonable possibility can
the . . . legislation fall within the wide range of discretion
permitted to the Congress.").

Additionally, Congress's broad power to appropriate funds
through the Spending Clause comes with an equally broad power to
impose certain conditions upon the states with respect to such
appropriations.  See Dole, 483 U.S. at 206-07. ("Congress may
attach conditions on the receipt of federal funds, and has
repeatedly employed the power 'to further broad policy objectives
by conditioning receipt of federal moneys upon compliance by the
recipient with federal statutory and administrative directives.'"

(quoting <u>Fullilove</u> v. <u>Klutznick</u>, 448 U.S. 448, 474 (1980) (plurality opinion)).  Legislation under the Spending Power is in the "nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." <u>Pennhurst State Sch. & Hosp.</u> v. <u>Halderman</u>, 451 U.S. 1, 17 (1981). Just as parties to a contract must be fully aware of the terms of the contract, each sovereign must "voluntarily and knowingly" accept conditions attached to federal funds.  <u>Arlington Ctr. School Dist. Bd. of Educ.</u> v. <u>Murphy</u>, 548 U.S. 291, 296 (2006) (quoting <u>Pennhurst</u>, 451 U.S. at 17).  Thus Congress must set out the conditions imposed upon the states "unambiguously."  <u>Id</u>; <u>see also</u> <u>Mr. I. ex rel. L.I.</u> v. <u>Maine School Admin. Dist. No. 55</u>, 480 F.3d 1, 14 (1st Cir. 2007).  The Supreme Court further opined: "[b]y insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation."  <u>Pennhurst</u>, 451 U.S. at 17; <u>see also</u> <u>Dole</u>, 483 U.S. at 207.

At the other end of the spectrum, the touchstone of modern administrative law is the seminal case of <u>Chevron, U.S.A., Inc.</u> v. <u>Natural Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984).  <u>Chevron</u> presumed that, where a statute is ambiguous, Congress has delegated to a federal agency the task of filling in the gap reasonably.  <u>Id.</u> at 843-44; <u>see also</u> <u>Morton</u> v. <u>Ruiz</u>, 415 U.S. 199, 231 (1974) ("The power of an administrative agency to

administer a congressionally created and funded program
necessarily requires the formulation of policy and the making of
rules to fill any gap left, implicitly or explicitly, by
Congress.").  The existence of gaps logically implicates
ambiguities in the statute, and thus agencies are charged with
determining the gap fillers for the states that participate in
such program.

Thus, a tension is ripening between our administrative state
and a state's sovereign power to accept conditions imposed upon
it through federal spending programs.[9] _Pennhurst_'s clear-
statement requirement and _Chevron_'s deferential presumption are
thus at odds with each other.  _See_ _Virginia Dep't of Educ._ v.
_Riley_, 106 F.3d 559, 580 (4th Cir. 1997) (Hall, J., dissenting)
(criticizing majority for eviscerating rule of _Chevron_ and
establishing clear-statement rule that is "as unprecedented as it
is unworkable").

Here, Mass. Services contends that section 1396n(g)(2) did
not "unambiguously" specify what conditions would be imposed upon
the state regarding reimbursement for direct services, and is
therefore an unconstitutional exercise of Congress's Spending

---

[9] For an excellent discussion of the pending conflict
between the clear-notice requirement in Spending Clause
disbursements and _Chevron_ see David Freeman Engstrom, _Drawing
Lines Between Chevron and Pennhurst: A Functional Analysis of the
Spending Power, Federalism, and the Administrative State_, 82 Tex.
L. Rev. 1197 (2004) and  Peter J. Smith, _Pennhurst, Chevron, and
the Spending Power_, 110 Yale L.J. 1187 (2001).

Power by violating <u>Pennhurst</u>'s clear-notice rule. This Court
need not reach the constitutional conflict between <u>Chevron</u> and
<u>Pennshurt</u> here, however, because as explained below, in this
instance, Mass. Services was aware up front of the conditions
placed upon the Funds.

**B.   The Definition of "Case Management"**

    1.   Chevron Deference: the Standard of Review Applied
        to the Agency's Legal Interpretations

Traditionally, a court's review of an administrative
interpretation of a statute follows the standard set up in
<u>Chevron</u>. In <u>Chevron</u> the Supreme Court stated:

> If the intent of Congress is clear, that is the end of
> the matter; for the court, as well as the agency, must
> give effect to the unambiguously expressed intent of
> Congress. If, however, the court determines Congress has
> not directly addressed the precise question at issue, the
> court does not simply impose its own construction on the
> statute, as would be necessary in the absence of an
> administrative interpretation. Rather, if the statute is
> silent or ambiguous with respect to the specific issue,
> the question for the court is whether the agency's answer
> is based on a permissible construction of the statute.

<u>Chevron</u>, 467 U.S. at 842-43. Thus, the courts must make two
inquiries: Is the intent of Congress apparent from the text of
the statute?, and if Congress's intent is not explicit: Did the
agency permissibly construe the statute? <u>Id.</u> at 842-43. The
Medicaid Act is one of two-dozen statutes that regularly trigger
<u>Chevron</u> deference. <u>See</u> William N. Eskridge, Jr. & Lauren E.
Baer, <u>The Continuum of Deference: Supreme Court Treatment of
Agency Statutory Interpretations from Chevron to Hamdan</u>, 96 Geo.

L.J. 1083, 1186 (2008).

"The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." Elien v. Ashcroft, 364 F.3d 392, 396 (1st Cir. 2004) (quoting Morton, 415 U.S. at 231). Accordingly, administrative rules carry a degree of deference that courts must respect. United States v. Mead Corp., 533 U.S. 218, 228 (2001); see also Bragdon v. Abbott, 524 U.S. 624, 642 (1998) ("[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'") (quoting Skidmore v. Swift & Co., 323 U.S. 134, 139-40 (1944)).

The deferential weight given to administrative rules, however, varies under the circumstances. Mead Corp., 533 U.S. at 228. The degree of formality in which the rules were promulgated directly influences the amount of deference to be applied. See Reno v. Koray, 515 U.S. 50, 61 (1995) (stating that guidelines not "subject to the rigors of the [APA], including public notice and comment," are entitled only to "some deference"). To reap the full benefit of Chevron deference, the agency's interpretation ought have gone through the required notice-and-comment procedure mandated by the APA. See Duckworth v. Pratt &

Whitney, Inc., 152 F.3d 1, 5 (1st Cir. 1998) (citing 5 U.S.C. §
553).  This Court notes that Chevron deference may nonetheless be
justified in cases where "no such administrative formality was
required and none was afforded."  Mead Corp., 533 U.S. at 231
(citing NationsBank of N.C. v. Variable Annuity Life Ins. Co.,
513 U.S. 251, 256-57 (1995)).

      2.   "Cooperative Federalism"

The cooperative nature of Medicaid also implicates the
application of Chevron deference to the agency's interpretation
of the statute.  In Harris v. McRae, the Supreme Court outlined
the federal-state relationship regarding fund reimbursement:

> The cornerstone of Medicaid is financial contribution by
> both the Federal Government and the participating State.
> Nothing in Title XIX as originally enacted, or in its
> legislative history, suggests that Congress intended to
> require a participating State to assume the full costs of
> providing any health services in its Medicaid plan.
> Quite the contrary, the purpose of Congress in enacting
> Title XIX was to provide federal financial assistance for
> all legitimate state expenditures under an approved
> Medicaid plan.

448 U.S. 297, 308 (1980).

The Supreme Court describes cooperative federalism as a
system that "leaves to the States the primary responsibility for
developing and executing . . . programs . . . [but] imposes
significant requirements to be followed in the discharge of that
responsibility."  Schaffer v. Weast, 546 U.S. 49, 52 (2005)
(quoting Board of Ed. of Hendrick Hudson Central School Dist.,
Westchester Cty. v. Rowley, 458 U.S. 176, 183 (1982)).  In other

words, cooperative federalism "best describes those instances in
which a federal statute provides for state regulation or
implementation to achieve federally proscribed policy goals."
Philip J. Weiser, Towards a Constitutional Architecture for
Cooperative Federalism, 79 N.C.L. Rev. 663, 668 (2001) (citing
New York v. United States, 505 U.S. 144, 167 (1992)).  Medicaid's
payment structure works a slight variation into the traditional
cooperative federalism paradigm.  See id. ("[I]n the Medicaid
Act, Congress relies on a federal regulatory agency to develop
certain standards for the state agencies to follow when
implementing the federal statutory scheme that provides federal
funding to the states.")  "Within the confines of the [Medicaid]
statute, rules, and regulations, the states enjoy considerable
flexibility in fashioning their own reimbursement systems."
Danvers Pathology Associates, Inc. v. Atkins, 757 F.2d 427, 428
(1st Cir. 1985); see also Louisiana Dep't of Health & Hosps. v.
Ctr. for Medicare & Medicaid Servs., 346 F.3d 571, 572 (5th Cir.
2003) ("The Medicaid statute gives each state flexibility in
designing and administering its own Medicaid program."); Michael
Reese Physicians & Surgeons, S.C. v. Quern, 606 F.2d 732, 735
(7th Cir. 1979) ("Medicaid is an experiment in cooperative
federalism, which literally abounds with options."), reh'g en
banc, 625 F.2d 764 (1980), cert. denied, 449 U.S. 1079 (1981).

Although the First Circuit explicitly has stated that the

"usual [Chevron] deference must give way somewhat to the cooperative federalism goals of the Medicaid program," Massachusetts v. Sec'y of Health and Human Servs., 816 F.2d 796, 801 (1st Cir. 1987), the deferential weight to be given to a federal agency's interpretation of the Medicaid statute cannot wholly subside.  The First Circuit did not calibrate the degree to which the usual deference "must give way" to the goals of the Medicaid statute.  Moreover, even after announcing that deference must be tempered in the Medicaid context, the First Circuit continues to apply Chevron deference to the Medicaid statute. See Visiting Nurse Ass'n v. Bullen, 93 F.3d 997, 1002 (1st Cir. 1996).  Accord Sidell v. Commissioner, 225 F.3d 103, 109 (1st Cir. 2000) (citing Visiting Nurse Ass'n, 93 F.3d at 1002).  As Holmes would readily recognize, this Court must follow not only what the First Circuit says but what it does.

> 3.   The Agency's Interpretation of the Case Management Services Definition

At the time at issue here, i.e. 2002 and 2003, the Act, as amended by Comprehensive Omnibus, Reconciliation Act ("COBRA"), Pub. L. No. 99-272 § 9508, 100 Stat. 82, 210-11 (April 7, 1986), defined case management services as "services which will assist individuals eligible under the plan in gaining access to needed medical, social, educational and other services."  42 U.S.C. 1396n(g)(2)(A)(i).  It was not until 2005, when the Act was amended by the Deficit Reduction Act ("DRA"), Pub. L. No. 109-171

§ 6052, 120 Stat. 93-95 (2005), that the more detailed definition of case management services there enacted clarified that case management services "does not include the direct delivery of an underlying medical, social, educational and other services to which an eligible individual has been referred."  42 U.S.C. § 1396n(g)(2)(A)(iii).

Prior to the 2005 amendment, however, the Department had interpreted the term as excluding direct services.  During the relevant period, the Department's interpretation that direct services were not included in case management services was available in the form of a State Medicaid Program Manual issued in 1991 ("Manual"), and State Medical Director Letter No. 01-013 of January 19, 2001, ("Director Letter").

In the note to section 4302.2.G.1, the Manual stated:

Although FFP may be available for case management activities that identify the specific services needed by an individual, assist recipients in gaining access to these services, and monitor to assure that needed services are received, FFP is not available for cost of these specific services, unless they are separately reimbursable under Medicaid.

A.R. 361.  The Director Letter stated that "[i]n general, allowable activities are those that include assistance in accessing a medical or other service, but do not include the direct delivery of the underlying service."  A.R. 164.  It then reiterated, under the caption "unallowable services," that "case management services do not include payment for the provision of

22

the direct services (medical, educational, or social) to which the Medicaid eligible individual has been referred." Id.

Generally, the state plan must be administered in conformity with the specific requirements of the applicable regulations and issuance of the official notice from the agency. See 42 C.F.R. § 430.10. As a participant in the Medicare program, Mass. Services had a "duty to familiarize itself with the legal requirements for cost reimbursement." See Heckler v. Community Health Servs. of Crawford County, Inc., 467 U.S. 51, 64 (1984).

Here, the Manual and the Director Letter are "prototypical example[s] of an interpretive rule 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 99 (1995) (quoting Chrysler Corp. v. Brown, 441 U.S. 281, 302, n.31 (1979)). Thus, they carry the same weight as an agency's interpretive rule. See id. ("Interpretive rules do not require notice and comment . . . they also do not have the force and effect of law and are not accorded that weight in the adjudicatory process.").

The deferential weight given to the interpretation depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." Mead Corp., 533 U.S. at 228. Looking at each of

23

these factors, the Department's interpretation should be accorded some weight.

The agency's interpretation here is reasonable.  At the time relevant here, the statute cursorily defined what case management services were.  The agency then developed a more thorough definition of case management services in both the Manual and the Director Letter, stating what types of activities the definition encompasses and emphasizing that direct services do not meet the definition.  It was reasonable to distinguish services whose purpose is to assist an individual in gaining access to social, medical or other services from the underlying or so called direct services.  It was also perfectly sound for the Department to interpret the Act such that direct services did not fall within the definition of case management services, and thus are not reimbursable as such, because allowing states to claim reimbursement for direct services both directly and as case management created the risk of double reimbursement.

In addition, the Department has never turned away from its position that direct services are not authorized under case management.  Its uniform approach is a key factor in the "power to persuade." Wisconsin Dep't of Health & Family Servs. v. Blumer, 534 U.S. 473, 505 (2002) (Stevens, J., dissenting).

Here, legislative history also supports the administrative interpretation.  Legislative history is both an appropriate tool

to discern congressional intent, <u>see</u> <u>Rolland</u> v. <u>Romney</u>, 318 F.3d
42, 48 (1st Cir. 2003) (citing <u>O'Neill</u> v. <u>Nestle Libbys P.R.,
Inc.</u>, 729 F.2d 35, 36 (1st Cir. 1984)), and to confirm a
statute's plain meaning.  <u>Phillips</u> v. <u>Pembroke Real Estate, Inc.</u>,
459 F.3d 128, 143 n. 12 (1st Cir. 2006) (citing <u>Greebel</u> v. <u>FTP
Software, Inc.</u>, 194 F.3d 185, 192 (1st Cir. 1999)).  In 1985,
when COBRA was enacted, neither the House nor the Senate
identified direct services as a type of service reimbursable
under Medicaid.  The Senate understood case management as a
"system under which responsibility for locating, coordinating,
and monitoring a group of services rests with a designated person
or organization."  S. Rep. No. 99-146 (1985), <u>reprinted in</u> 1986
U.S.C.C.A.N. 42, 313, 1985 WL 29974, at *280.  COBRA intended to
add case management to the types of services covered under
Medicaid.  <u>Id.</u>  ("The intent is to allow case management to be
provided as an additional service.  It is not the Committee's
intent that the States use case management solely to reduce
program costs.").  In addition, the House, in a conference report
on COBRA, agreed with the Senate's definition of case management,
albeit in different language.  H.R. Conf. Rep. No. 99-453, Sec.
9508 (1985), 1985 WL 724562 (proposing to define case management
services as "services which will assist individuals eligible
under [Medicaid] in gaining access to needed medical, social,
educational, and other services.").  Combining Congress's
understanding of case management - namely a system where

individuals or organizations will locate, coordinate, and monitor individuals so that they may gain access to medical, social, and educational services - with the goal of COBRA, illuminates Congress's simple goal.  Congress intended that states would act as indispensable advisors for Medicaid eligible individuals through assisting those individuals in finding services, not providing the services themselves.

The later views of Congress buttress the position that Congress never intended for reimbursement of direct services during the audited years.  "[T]he view of a later Congress does not establish definitively the meaning of an earlier enactment, but it does have persuasive value."  Bell v. New Jersey, 461 U.S. 773, 784 (1983); O'Gilvie v. United States, 519 U.S. 79, 90 (1996); Gozlon-Peretz v. United States, 498 U.S. 395, 406 (1991) (citing Bell, 461 U.S. at 784).

In 2005, the DRA clarified that "[d]irect delivery of an underlying medical, educational, social, or other service to which an eligible individual has been referred" is not case management service and would not be reimbursable.  See Deficit Reduction Act § 6052(a)(2)(A)(iii) (amending 42 U.S.C. § 1396n(g)(2)).  With respect to services that constitute case management, Congress developed a non-exclusive list based on the Director Letter.  Compare DRA § 6052(a)(2)(A)(ii) with Director Letter, A.R. 164 (including: (1) assessment to determine service

26

needs (2) development of specific care plan, (3) referral to help obtain needed services (4) monitoring to ensure care plan is implemented and adequate.).

The Defendants also point this Court to legislative history that indicates that direct services are not reimbursable under Medicaid because they are reimbursable under other federal programs. See A.R. 375, S. Rep. No. 99-146 at *312 ("Medicaid is intended to be the payer of last resort, that is, other available resources must be used before Medicaid pays for the care of an individual enrolled in the Medicaid program."). Additionally, during the hearings on the DRA, the House Conference Report stated: "consistent with existing Medicaid law, this proposal would also specify that federal Medicaid funding would only be available for [case management] services if there are no other third parties liable to pay for such services, including as reimbursement under a medical, social, educational, or other program." A.R. 375, H.R. Rep. No. 109-362 at *322.

As explained above, the reasoning expressed within these interpretive rules is sound, the agency has not waivered from its interpretation, and it seems to be supported by both legislative history and the actions of a later Congress. Therefore, after weighing the co-operative federalism goals of Medicaid, the broad authority of the Department, and the formality with which the rules were enacted, this Court affords the Manual and the

Directors Letter some deference.

         4.   Retroactivity

     Mass. Services argues that in 2002 and 2003 there was no
clear statement that case management services did not include
direct services, and that section 1396n(g)(2)(A)(iii) cannot
apply retroactively.  Pl.'s Mem. 2-3.  Mass. Services claims
therefore that the exclusionary rule applying to all direct
services which, was the basis for the Board's Decision was, at
that time, arbitrarily adopted by the Board.  Id. at 7.

     The conditions imposed upon a states's receipt of funds
cannot be retroactive - that is, after a state's receipt of
monies, Congress or an agency cannot then place specific
conditions on its use.  See Bowen v. Georgetown Univ. Hosp., 488
U.S. 204, 208 (1988) (holding that retroactive application of
agency regulations promulgated after the conduct at issue is
disfavored).

     In Bennett v. Kentucky Dep't of Edu., 470 U.S. 656 (1985), a
prospective conditions case, the Supreme Court upheld the
conditions of the 1970 Amendments to the Elementary and Secondary
Education Act of 1965, Pub. L. 89-10, 79 Stat. 27 (codified as
amended at 20 U.S.C. § 2701 et seq.), which prohibited the use of
federal grant monies simply to replace state and local
expenditures, and held that Kentucky was adequately notified of
the conditions beforehand.  Id. at 659.  In ruling that the

Amendment and its regulations duly notified Kentucky, the Supreme Court noted that "Pennhurst does not suggest that the Federal Government may recover misused federal funds only if every improper expenditure has been specifically identified and proscribed in advance." Id. at 666.  Additionally, the Supreme Court in describing the cooperative nature of the statute at issue stated:

> Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy. Title I, for example, involved multiple levels of government in a cooperative effort to use federal funds to support compensatory education for disadvantaged children. The Federal Government established general guidelines for the allocation and use of funds, and the States agreed to follow those guidelines in approving and monitoring specific projects developed and operated at the local level. Given the structure of the grant program, the Federal Government simply could not prospectively resolve every possible ambiguity concerning particular applications of the requirements of Title I.

Id. at 669 (internal citations omitted).  Taking these two statements together reveals that prior notice of the general principle to be regulated in a cooperative scheme between the federal government and the states does not need to be all encompassing.

The Supreme Court jurisprudence thus erects these two bookends - retroactivity is unconstitutional and prospective notice satisfies the requirements of the Spending Clause.  Where ought this case be placed between these two bookends?

The instant case does not involve retroactive application of law, and it is akin to <u>Bennett</u>.  The Manual and the Director Letter constituted an adequate notice to Mass. Services concerning the limitations imposed on the expenditure of the federal Funds.  Therefore, the Court defers to the interpretation of case management supplied by the Manual and the Director Letter during the relevant time period, such that case management does not include direct services.

     **C.**    **The Board's Decision**

        1.    "Arbitrary or Capricious": the Standard of Review Applied to the Agency's Fact Finding

Pursuant to the Administrative Procedure Act ("APA") 5 U.S.C. § 706(2)(A), under which Mass. Services seeks review, an agency's final determination will be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  Arbitrary and capricious action lacks a rational basis.  <u>Motor Vehicle Mnfr. Ass'n</u> v. <u>State Farm Mut. Auto Ins. Co.</u>, 463 U.S. 29, 42-43 (1983); <u>Rhode Island Higher Educ. Assistance Auth.</u> v. <u>Sec'y, U.S. Dept. of Educ.</u>, 929 F.2d 844, 855 (1st Cir. 1991).  The agency's determination is afforded a presumption of validity so review is highly deferential.  <u>Carcieri</u> v. <u>Kempthorne</u>, 497 F.3d 15, 43 (1st Cir. 2007).  If the agency articulated a rational basis for its decision, the court must accept the validity of that decision. See <u>Bowman Transp., Inc.</u> v. <u>Arkansas-Best Freight Sys., Inc.</u>, 419

U.S. 281, 290 (1974).  "[A] court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  Motor Vehicle, 463 U.S. at 43 (internal quotations omitted).

Despite the highly deferential treatment afforded to an agency's final decision under the arbitrary and capricious standard, review is not a mere "rubber stamp."  Federal Labor Relations Auth. v. Aberdeen Proving Ground, Dept. of the Army, 485 U.S. 409, 414 (1988) (per curiam) ("[District Court] must not rubber-stamp . . . administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.") (internal quotation omitted).

The agency's determination must be supported by substantial evidence, and is upheld when such evidence exists.  Sistema Universitario Ana G. Mendez v. Riley, 234 F.3d 772, 777 (1st Cir. 2000).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Clean Harbors Envtl. Servs., Inc. v. Herman, 146 F.3d 12, 21 (1st Cir. 1998) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  While this standard requires "more than a scintilla, it certainly does not approach the

31

preponderance-of-the-evidence standard normally found in civil

cases." <u>Vieques Air Link, Inc</u>. v. <u>U.S. Dept. of Labor</u>, 437 F.3d

102, 104 (1st Cir. 2006) (quoting <u>Bath Iron Works Corp.</u> v. <u>U.S.</u>

<u>Dep't of Labor</u>, 336 F.3d 51, 56 (1st Cir. 2003)).  In sum,

"substantial evidence" requires that there be data in the record

to undergird the rationale the agency used when it articulated

the basis for the decision it made.

    2.   Application

To determine whether a service constitutes "case management

services," the Board was required to make "an inquiry into the

<u>nature of the services</u>, not just into what they are called or who

provides them." <u>Massachusetts</u> v. <u>Sec'y of Health and Human</u>

<u>Servs.</u>, 816 F.2d at 804**.**  The Board, following the Review's

analysis, took into consideration the definition that

Massachusetts had provided for different cost centers in the

RMTS.  Although the Board failed to clearly explain why in its

opinion the cost centers were direct services,[10] it appropriately

focused on whether the purpose of provided services was the one

prescribed in the definition of case management services, <u>i.e.</u>

assisting individuals in gaining access to medical, educational,

and social services.

---

[10] See, for example, this wholly conclusory statement - "it
is apparent from the relevant activity codes that some of the
services captured by [case management] cost centers were direct
services."  Board's Decision, at *HHS 23.

In challenging the Board's Decision as arbitrary and capricious, Mass. Services makes several arguments.  First, it argues that when the Board examined the issues here, the Board failed to focus on the nature of the services themselves, but focused instead on who performed the services.  Pl.'s Mem. 11-12. Second, Mass. Services contends that the Board's Decision was improperly based on the RMTS descriptions rather than the underlying case notes for each service provided.  Third, Mass. Services argues that the Board misinterpreted the "protective intake" cost center.  Finally, Mass. Services argues that the Board should not have rejected categories that were explicitly approved in the 1994 Plan.

            a.   Nature of the services

     Mass. Services argues that by arbitrarily excluding "direct services," the Board was improperly focusing on services provided by the Massachusetts Department of Social Services' caseworkers. In making this argument, Mass. Services relies heavily upon Massachusetts v. Heckler, 616 F. Supp. 687 (D. Mass. 1985) (Garrity, J.), aff'd in part and vacated in part sub nom. Massachusetts v. Sec'y of Health and Human Servs., 816 F.2d 796 (1st Cir. 1987), aff'd in part and rev'd in part sub nom. Bowen v. Massachusetts, 487 U.S. 879 (1988).

     The District Court in Heckler reversed the Secretary's denial and held the services at issue eligible for reimbursement.

It noted that the reason the Secretary denied reimbursements for "educational" services was because they were performed by employees of the State Department of Education, and not solely by the employees of Massachusetts Department of Mental Health. Bowen, 487 U.S. at 886.  The First Circuit stated that denial of reimbursement is appropriate only when the type of services provided are analyzed beyond a cursory look at their surface features – beyond "what they are called and who provides them." Massachusetts v. Sec'y of Health and Human Servs., 816 F.2d at 804.

Contrary to Mass. Services position, Heckler is not the case presented here.  The Board did not focus on who performed certain services, but rather it examined the nature of the services, concluding that they do not fall within the ambit of the statutory scheme because as categorized, the relevant "cost centers" described direct services.  Moreover, in contrast to Heckler, the Board did not simply look at the title given to particular cost centers, but analyzed the definition of each cost center under the RMTS.

        b.    Review of underlying case notes

Next, Mass. Services argues that the Board's Decision was arbitrary because it looked to the RMTS cost centers rather than the underlying case notes.  Mass. Services argues that the underlying case notes, even those identified by the Center, often

34

described case management activities even if they were categorized in a cost center that, as a broad category, might not describe a case management activity.  Pl.'s Mem. 12-15.  In response to this argument, the Board held that requiring the auditors to verify the unallowability of each and every underlying case note "would impose an unreasonable administrative burden and unduly frustrate the Center's legitimate effort to ensure that federal Medicaid dollars are spent properly."  Board Decision, 2008 WL 5501237, at *HHS 27.  Requiring such an onerous exercise on the part of the Centers seems especially unfounded where the states never have to analyze each underlying case note to begin with, but are allowed to calculate the level of reimbursement based on statistical sampling.

Mass. Services also argues that by failing to look at the underlying activity, the "disallowance fails to honor overlap" between activities that can be considered both a direct social service and "case management."  Pl.'s Mem. 13.  First, the Review did not recommend disallowance of cost centers that the Review found had a dual nature, thus the Board's decision does not discuss them.  Second, the Board held that Mass. Services did not meet its burden of proof as to disputed matters.[11]  The Board

_____

[11] The burden of proof at the hearing level was indeed on Mass. Services.  Title 42 C.F.R. § 430.30(e) establishes applicability of uniform administrative requirements and cost principles (45 C.F.R. Part 74) to the administration of funds under Medicaid.  Based on those general requirements, the Board held in its previous decision, that the grantee bears the burden

noted that "[t]o the extent that some of these activity codes
[analyzed under the 'remaining excluded cost centers' part of the
decision] can be read as capturing both direct services and [case
management services], the burden was on [Mass. Service] to
identify and quantify the allowable [case management services]
costs allocated to the corresponding cost centers."  Board
Decision, 2008 WL 5501237, at *HHS 25.   The Board concluded that
Mass. Services failed to meet its burden.  <u>Id.</u>  It similarly
stated that the activity captured in paragraph five of case
management cost center "assisting clients, on an ongoing basis,
in identifying and obtaining available services to meet assessed
needs" seems to have a purpose appropriate for case management
services, but again Mass. Services did not meet its burden to
show what part, if any, of any costs assigned to the case
management cost centers were devoted to activities described in
paragraph five.  <u>Id.</u> at *HHS 22.   The Board further stated:

> [I]t is conceivable that the amount of allowable costs
> captured by paragraph five of the case management [cost
> centers] activity codes was insignificant, or even zero,
> because the criteria in paragraph five overlaps [with]
> criteria in other activity codes that, on their face, are

of establishing allowability of the cost, and that "if an audit
report makes findings that certain costs or claims for
expenditures are not proper" the grantee must "show in response
to audit report that its claim is proper".  <u>See</u> <u>Decision No. 204,</u>
<u>New York Department of Social Services</u>, 1981 WL 158321 at *5.
Similarly, in a challenge to an administrative hearing, the
burden is on the party bringing the challenge to demonstrate how
the opinion was arbitrary or capricious.  <u>See</u> <u>Guaranty Sav. &</u>
<u>Loan Ass'n</u> v. <u>Fed. Home Loan Bank Bd.</u>, 794 F.2d 1339, 1342 (8th
Cir. 1986).

> more tightly focused on capturing allowable case
> management activities and whose corresponding cost
> centers were retained in the [Review's case management
> services] rate recalculation.

Id. Thus, it is not clear that any of the underlying activities in this cost center could be considered case management.  To the extent that there were instances where the activities captured in this cost center were reimbursable, Mass. Services failed to come forth with such evidence.

c.   The "Protective Intake" cost center

Mass. Services argues that the Board overlooked its arguments that the activities in the "protective intake" cost center do not comprise direct services.  Mass. Services' argues that "protective intake" is a case management service because it is "the first step in the process of developing a child's service plan and that it involves assessing and reassessing the child's needs for services of all kind."  Pl.'s Mem. 15.  In considering this argument, the Board emphasized that what makes an activity fall under the case management services definition is that it serves the purpose of case management **directly and substantially**. Board's Decision, 2008 WL 5501237, at *HHS 18 (emphasis added).[12] The Board noted that the statute does not authorize as case

---

[12] The Board stated: "[w]hile [some] types of activities may be some of the means by which [protective intake is] undertaken, they do not themselves constitute case management unless they directly and substantially serve the purpose of case management." Board's Decision, 2008 WL 5501237, at *HHS 18.

management services, those activities "whose purpose is to verify that a prospective program participant needs, is eligible for, or is otherwise appropriate to receive, the program's services." Id. at *HHS 19.

d. Reliance on the approved 1994 Plan

Finally, Mass. Services argues further that because the 1994 Plan was approved by the Center, the agency cannot now back off its view as to what services are reimbursable. Mass. Services refers to Hawaii Dep't of Soc. Servs. and Housing, No. 85-143, 1986 WL 290239, Decision No. 779 (Department of Health and Human Services Departmental Appeals Board, Aug. 21, 1986), where the Board overturned disallowance of funds, concluding that the federal law was ambiguous and Hawaii's interpretation was reasonable. There, the Board stated that "approval of a state plan provision [does not] mean[] so much that a state can ignore clearly applicable rules and regulations" nor does "approval of a state plan provision mean[] so little that the Agency can unilaterally and retroactively disavow that to which it clearly agreed." Hawaii Dep't of Soc. Servs. and Housing, 1986 WL 290239, at *5. Here, nothing in the approval of the 1994 Plan indicated that the Department agreed to reimburse Mass. Services for direct services, nor did it state that services claimed were not direct services.

As described above, the Board's Decision was based

reasonably on the RTMS and analyzed the nature of the services performed.  In these circumstances, the Board's Decision must stand.

## IV.  CONCLUSION

The Board's Decision disallowing certain Funds claimed for case management services, was based on an appropriate determination that the services at issue there did not meet the definition from 42 U.S.C. § 1396n(g)(2), as interpreted by the Manual and the Director Letter.  Accordingly, judgment shall enter for the Defendants.

**SO ORDERED.**

 /s/ William G. Young
**WILLIAM G. YOUNG**
**DISTRICT JUDGE**